# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| JIMMIE W., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 19 C 2601** |
| v. | ) | |
| | ) | **Magistrate Judge Gabriel A. Fuentes** |
| KILOLO KIJAKAZI, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## AMENDED MEMORANDUM OPINION AND ORDER[2]

Before the Court are Plaintiff Jimmie W.'s[3] motion for summary judgment seeking remand of the final decision of the Commissioner denying him Disability Insurance Benefits ("DIB") (D.E. 16) and the Commissioner's cross-motion to affirm the decision. (D.E. 27.)

---

[1] The Court substitutes Kilolo Kijakazi for her predecessor, Andrew Saul, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2] On May 16, 2019, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to a United States Magistrate Judge for all proceedings, including entry of final judgment. (D.E. 7.) On August 22, 2019, this case was reassigned to this Court for all proceedings. (D.E. 11.)

[3] The Court in this opinion is referring to Plaintiff by his first name and first initial of his last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id.* A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id.*, citing *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing, and it is not clear whether any party could make that showing in this matter. In any event, the Court is abiding by IOP 22 subject to the Court's concerns as stated.

## BACKGROUND

### I.  Procedural History

Plaintiff applied for DIB in August 2010, alleging a disability onset date of August 30, 2008. (R. 163.) His date last insured ("DLI") was December 31, 2013.[4] (R. 655.) In January 2012, after a hearing, the Administrative Law Judge ("ALJ") issued an opinion denying Plaintiff's application for benefits, and the Appeals Council subsequently denied review. (R. 46-68.) Plaintiff sought review in federal district court, and on February 20, 2015, the district court remanded the case to the Commissioner. The court ordered that on remand, "the ALJ shall reevaluate the weight to be afforded Dr. May's opinion," and "[i]f the ALJ finds 'good reasons' for not giving Dr. May's opinion controlling weight . . . the ALJ shall explicitly consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Wiley v. Colvin*, No. 12 C 9482, 2015 WL 753874, *5-6 (N.D. Ill. Feb. 20, 2015) (citing 20 C.F.R. § 404.1527(c)(2)-(5)). In addition, the district court ordered that on remand, "the ALJ shall reevaluate Plaintiff's complaints with due regard for the full range of medical evidence," and "then reevaluate Plaintiff's physical impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of his findings in accordance with applicable regulations and rulings." *Id*. at *7-8.

On June 6, 2016, Plaintiff received another hearing before the ALJ (R. 685), and on September 21, 2016, the ALJ issued a written opinion again finding Plaintiff was not disabled. (R. 672.) On February 23, 2019, the Appeals Council denied Plaintiff's request for review of the ALJ's

---

[4] To obtain DIB, a claimant must establish that he or she became disabled before their date last insured. *Kaplarevic v. Saul*, 3 F.4th 940, 942 (7th Cir. 2021); *see also McHenry v. Berryhill*, 911 F.3d 866, 869 (7th Cir. 2018) (same).

September 2016 decision (R. 635), making the ALJ's decision the final decision of the Commissioner. *Butler v. Kijakazi*, 4 F.4th 498, 500 (7th Cir. 2021).

## II.     Administrative Record

In 2007, before his alleged disability onset date, Plaintiff was in a car accident, after which he received several lumbar (lower back) epidural steroid injections and facet joint injections from Yuan Chen, M.D., to treat his lower back pain. (R. 386.) Imaging showed mild degenerative lumbar disc disease, causing mild bilateral foraminal stenosis (narrowing of disc space). (R. 405.) The injections gave Plaintiff "significant pain relief," but his pain returned after a full day of working as a plumber. (R. 389, 392, 395, 398, 401.)[5]

### A.     Evidence Between Plaintiff's Alleged Onset Date and His DLI

On September 25, 2008, Plaintiff underwent lumbar disc decompression, a "minimally invasive" surgical procedure to remove the damaged portion of a herniated disc.[6] (R. 404-06.) In October, a lumbar spine MRI showed mostly mild to moderate stenosis, but moderate to severe neuroforaminal stenosis at L4-5 (R. 384), and EMG testing in November showed mild to moderate sensorimotor loss in Plaintiff's lower extremities. (R. 569.) Plaintiff underwent four sessions of physical therapy ("PT") in November and December, but although he reported symptom relief, he was discharged for nonattendance. (R. 574.)

In February 2009, Tehmina Bajwa, M.D., filled out a medical source statement indicating Plaintiff ambulated normally without an assistive device, could lift and carry 10 pounds, and took NSAIDs (non-steroidal anti-inflammatories), Norco (narcotic), and a muscle relaxer for pain, with a side effect of drowsiness. (R. 493-95.) The following month, a non-examining state agency

---

[5] Plaintiff also receives treatment for diabetes and hypertension, but he does not contend that the ALJ's decision erred in addressing these impairments, so the Court does not address them here.

[6] https://www.mayoclinic.org/tests-procedures/diskectomy/about/pac-20393837.

physician assessed Plaintiff with a light residual functional capacity ("RFC") with some additional postural limitations. (R. 552-58.) In November 2009, William Malik, M.D., examined Plaintiff for purposes of his disability benefits claim. He found Plaintiff was able to ambulate on his heels and toes but his range of motion ("ROM") in his lumbar spine was limited. (R. 378.) Dr. Malik opined that Plaintiff would be capable of either sedentary or light work. (*Id*.)

The record shows that in 2010, Plaintiff had monthly visits with Percy Conrad May, M.D. In April, Plaintiff complained of lower back pain, and examination showed decreased ROM and tenderness in his lower back; Dr. May prescribed Vicodin (narcotic), Tramadol (narcotic) and naproxen (NSAID) for pain. (R. 439-40.) From May through October, Plaintiff continued to complain of severe lower back pain; Dr. May recorded normal physical examinations and refilled prescriptions for Plaintiff's pain medications. (R. 415-35, 458-61.) In September, a non-examining state agency physician again found Plaintiff capable of light work. (R. 446-53.)

On October 30, 2010, Plaintiff was involved in another motor vehicle accident and sought treatment at the emergency department for low back pain, chest pain and headaches. (R. 594-99.) Examination revealed neck and lower back tenderness and normal ROM. (R. 600.) X-rays of Plaintiff's lumbar spine showed mild degenerative changes but were otherwise normal. (R. 610.) Plaintiff was discharged the next day with prescriptions for Flexeril (muscle relaxant) and Toradol (NSAID). (R. 612-13.) In November, Plaintiff followed up with Dr. May, complaining of back pain, periodic headaches and neck pain. (R. 463-70.) His physical examinations showed limited lower back ROM and difficulty squatting and heel walking. (R. 464-70.) Dr. May prescribed Vicodin and 400-600mg of ibuprofen. (R. 466.) On November 8, Dr. May filled out a medical source statement opining that Plaintiff could only sit for 15 minutes at a time, stand for 10 minutes at a time, sit/stand/walk less than two hours total in an eight-hour day, and would need to walk

around for eight minutes every 10-15 minutes and elevate his legs 15% of the day. (R. 623-26.) Dr. May opined Plaintiff would be off task 20 percent of the day. (R. 626.) In December 2010, a non-examining state agency physician reviewed the more recent medical evidence and affirmed the September physical RFC evaluation finding Plaintiff capable of light work. (R. 471-73.)

The next evidence in the record comes from Plaintiff's first hearing before the ALJ on December 6, 2011. Plaintiff testified that he had throbbing lower back pain radiating down his left leg that made it hard for him to get dressed, get out of bed, and sit or stand for longer than 15 to 20 minutes at a time. (R. 18, 22, 25.) He had trouble working as a plumber due to pain and thought about starting his own business, but then realized he could receive a pension if he retired from plumbing, which he did in October 2009. (R. 27-28.) An independent medical expert, James McKenna, M.D., testified that Plaintiff's back pain stemmed mostly from peripheral neuropathy as opposed to radiculopathy, despite evidence of degenerative changes.[7] (R. 8, 15.) Dr. McKenna opined that Plaintiff should be limited to lifting 20 pounds occasionally and 10 pounds frequently, and that Plaintiff could sit, stand and walk for up to six hours in an eight-hour day, with some additional postural and environmental limitations. (R. 13-15.)

In April 2012, Dr. May provided a written statement of "continuance of disability" to Plaintiff's pension fund, stating that Plaintiff had been unable to perform any work due to diabetes, lumbar radiculopathy, and hypertension since October 1, 2009. (R. 1008-09.) In June 2012, an x-ray of Plaintiff's lumbosacral spine was normal (R. 1902), and an x-ray of his left knee showed slight narrowing and edema in the joint. (R. 1903). In July 2012, Plaintiff visited Richard

---

[7] "Radiculopathy symptoms may overlap with those of peripheral neuropathy . . . Peripheral neuropathy is the damage of the peripheral nervous system," while "[r]adiculopathy is the pinching of the nerves at the root, which sometimes can also produce pain, weakness and numbness." https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy.

Stringham, M.D., for follow-up on his back and left knee pain. (R. 1123-25.) Plaintiff's physical examination was normal, and the doctor refilled his prescription for Norco. (R. 1125.) In October 2012, Plaintiff performed a treadmill stress test for 9 minutes, 12 seconds at 10 METS.[8] (R. 1583.)

In July 2013, Plaintiff had a follow-up visit with Dr. Stringham; he prescribed Norco for Plaintiff's back pain and "more strongly encouraged patient again" to participate in PT. (R. 1115-17.) In October 2013, Plaintiff returned to Dr. Stringham, complaining of left knee pain and chronic back pain; Dr. Stringham again prescribed Norco. (R. 1111-13.)

**B.     Evidence Post-Dating Plaintiff's DLI**

In February 2014, Plaintiff told Dr. Stringham that shoveling snow had aggravated his back pain; Plaintiff continued to take Norco for his pain. (R. 1358-60.) A March MRI of Plaintiff's lumbar spine showed progression from previous imaging, specifically, severely degraded L5-S1 facet joints. (R. 1900-01.) In April, Plaintiff returned to Dr. May, complaining of back pain at a level of four out of 10 and right arm pain. (R. 1023.) On examination, Plaintiff's back was tender in the lumbar area with decreased flexion. (R. 1027.) In August and November, Plaintiff again reported to Dr. May that he had severe low back pain with decreased ROM (R. 1012-18), and on November 14, 2014, Dr. May wrote a letter stating that Plaintiff's back pain had not improved since the April 2007 car accident and was not expected to improve over time. (R. 1934.)

In October 2014, EMG testing indicated Plaintiff had carpal tunnel syndrome ("CTS") in his left hand. (R. 1413-15.) On October 27, he underwent left endoscopic carpal tunnel release.[9]

---

[8] METs, or metabolic equivalents, measure the intensity of an exercise or activity, with one MET representing the amount of energy an individual uses while sitting quietly. https://www.hsph.harvard.edu/nutritionsource/staying-active/. A stress test usually involves walking on a treadmill while a person's heart rhythm, blood pressure and breathing are monitored; it is usually performed on someone with signs or symptoms of coronary artery disease. https://www.mayoclinic.org/tests-procedures/stress-test/about/pac-20385234.

[9] Surgery during which a surgeon cuts through the ligament that is pressing down on the carpal tunnel. https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/carpal-tunnel-release.

(R. 1059.) That month, Plaintiff also reported right knee pain, and an x-ray of his right knee showed mild to moderate degenerative changes with narrowing of the joint space. (R. 1049.) In March 2015, Plaintiff developed CTS in his right hand and subsequently underwent right endoscopic carpal tunnel release. (R. 1066-70, 1409.) That month, Dr. May recorded that Plaintiff's back range of motion was within normal limits and he had no pain. (R. 1042.)

## III.    Evidentiary Hearing

On June 6, 2016, Plaintiff and Dr. McKenna testified at a second hearing before the ALJ. Plaintiff testified that he continued to have the same problems with his back that he experienced after the 2007 car accident: extreme pain in his lower back radiating down his left leg. (R. 702.) He testified that his pain limited him to lifting about five pounds and standing up to 15 minutes. (R. 709-11.) Plaintiff testified that he elevated his legs when sitting at home, and he had shooting pain in his back and leg at the hearing because his legs were not elevated. (R. 719.) Norco relieved his pain but made him sleepy and dizzy. (R. 721-22.)

Dr. McKenna testified that the October 2012 treadmill test demonstrated a "very significant level of exertion" and exercise that Plaintiff would not have been able to reach "with a significant limiting musculoskeletal impairment in feet, ankles, knees or hips or [] back." (R. 732-34.) Dr. McKenna opined that Plaintiff would be limited to light work before his DLI, but that if the March 2014 MRI of the lumbar spine (which showed significant bilateral facet arthropathy) was related back three months earlier to before the DLI, Plaintiff would be limited to sedentary work. (R. 738-39.) Dr. McKenna stated that there was no way to connect Plaintiff's CTS to before his DLI because it arose nine months later. (R. 740.)

The ALJ asked the vocational expert ("VE") to opine on the jobs available to hypothetical individuals limited to light and sedentary work. In the sedentary hypothetical, the individual could

lift up to 10 pounds occasionally; five pounds frequently; stand/walk two hours in an eight-hour day; sit up to six hours in an eight-hour day; frequently operate foot controls and push or pull; never climb ladders, ropes or scaffolds; occasionally climb ramps or stairs, balance, stoop, crouch, kneel or crawl; and had to avoid concentrated exposure to vibrations, dangerous and moving machinery and unprotected heights. (R. 753-55.) The VE testified that there were a significant number of jobs available for this individual in the national economy, even if a cane or sit/stand option were needed, but no jobs were available if the individual needed to elevate their legs for 15% of the workday. (R. 755-57.)

## IV. ALJ's Decision

On September 21, 2016, the ALJ issued a 20-page opinion finding Plaintiff was not disabled within the meaning of the Social Security Act from his alleged onset date of August 30, 2008 through his DLI of December 31, 2013. (R. 654.) The opinion is somewhat rambling and disorganized, but following the Seventh Circuit's dictate that courts consider "the whole of the ALJ's decision," including the entirety of the ALJ's discussion of the evidence, *Zellweger v. Saul*, 984 F.3d 1251, 1255 (7th Cir. 2021), the Court has gleaned the following from the ALJ's opinion.

The ALJ found Plaintiff had the severe impairments of degenerative disc disease of the lumbar spine with foraminal stenosis and radiculopathy, status post percutaneous disc compression at the left L4-5 and L5-S1, osteoarthritis of the bilateral knees, and bilateral CTS, but that Plaintiff's impairments did not meet or medically equal the severity of a listed impairment. (R. 656-57.) The ALJ assigned Plaintiff the reduced sedentary RFC that the ALJ presented in hypothetical to the VE at the hearing. (R. 658.)

The ALJ gave "very substantial weight" to Dr. McKenna's opinions from the December 2011 and September 2016 hearings because he was "familiar with the disability program," he cited

specific evidence in the record to support his conclusions, and he was "the only doctor who [] had the opportunity to review and evaluate the entire record, including both the written documentation and hearing testimony." (R. 667.) In particular, the ALJ relied on Dr. McKenna's opinion that Plaintiff's performance on the treadmill test in October 2012 "demonstrated a very significant level of exertion" which "an individual with a significant musculoskeletal impairment in the feet, knees, hips, or back would be incapable of" doing. (R. 664.) The ALJ also reviewed Dr. McKenna's testimony about the 2008 MRI and EMG testing of Plaintiff's lumbar spine and the March 2014 lumbar MRI and determined that the 2014 MRI "demonstrates a progression" of Plaintiff's impairments which could be related to the period before Plaintiff's DLI, and thus required a reduced sedentary RFC. (R. 656-57, 666-67.)

The ALJ noted that Dr. May was Plaintiff's long-time treating physician, but he accorded "[n]o significant weight" to Dr. May's November 2010 and November 2014 medical source statements, finding that the basis for Dr. May's opinions was "unclear" and that Dr. May's opinions were inconsistent with the medical record and Dr. May's own treatment records. (R. 668.) The ALJ appeared to review all of Dr. May's notes and opinions in the record, including examinations that showed Plaintiff had tenderness and decreased ROM in his lumbar spine on the one hand, and examinations that showed negative straight leg raising (testing used to assess lower back pain); intact ROM, strength, sensation, reflexes and coordination; and no musculoskeletal complaints on the other hand. (R. 666.) The ALJ found Dr. May's opinion that Plaintiff would be off task a significant amount of time was inconsistent with Dr. May's progress notes that "consistently noted . . . normal attention span and concentration." (R. 668.) The ALJ also found that Dr. May's suggestion that Plaintiff elevate his legs was "not seen in the record" and that Dr. May never mentioned the results of October 2012 treadmill test. (*Id.*) In addition, the ALJ noted that despite

Plaintiff's complaints of severe pain, treatment notes from Dr. May and other doctors in the record showed normal ambulation, full strength and full painless ROM, and Plaintiff had no further back surgeries or injections since 2008. (R. 660, 668.) Furthermore, the ALJ gave no weight to Dr. May's "cursory" November 2014 statement and his statements to Plaintiff's union pension fund because they contained no evidentiary support and no specific functional limitations. (R. 668-69.)

The ALJ accorded "significant weight" to Dr. Malik's November 2009 opinion that Plaintiff could perform sedentary or light work because Dr. Malik supported his opinion with the results of Plaintiff's MRI and EMG and Dr. Malik's own examination results, including that Plaintiff had limited lumbar ROM, was able to perform straight leg raise to 80 degrees, and was able to walk on his heels and toes. (R. 666, 669.) The ALJ noted that Dr. Chen also concluded that Plaintiff would be capable of either sedentary or light work, despite pain and some abnormal lumbar examination results, and that the non-examining state agency opinions from March 2009 and September 2010 opined Plaintiff could perform light work. (R. 666, 670.) The ALJ accorded "some weight" to the state agency opinions for the limited time period they covered. (*Id*.) The ALJ also gave "some weight" to the lifting limitations in Dr. Bajwa's February 2009 opinion because they were "generally consistent with the objective medical record as a whole." (R. 669.)

The ALJ noted that Plaintiff's function reports and hearing testimony indicated he was extremely limited in his ability to stand, sit or lift anything due to lower back pain. (R. 659-61.) However, the ALJ found that although Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms he alleged, his statements concerning the intensity, persistence and limiting effects of those symptoms were "not entirely consistent" with the evidence in the record. (R. 661.) The ALJ reasoned that Plaintiff's treatment and his response to that treatment did not support the alleged intensity of his symptoms. (R. 670.) For example, despite

10

alleging "ongoing problems with is back," Plaintiff has had no back surgeries or injections since 2008 and his daily activities included helping with household chores, mowing the lawn every other week (including pouring gas from a two-gallon container), singing in the church choir (which required some travel), and exercising or walking for exercise. (R. 659-61, 667.) In addition, although Plaintiff's symptoms improved with PT, he was discharged for nonattendance. (R. 666.)

The ALJ also pointed out several inconsistencies in Plaintiff's testimony. For example, the ALJ found Plaintiff's testimony that his medications caused drowsiness and dizziness was "reasonable" but that these side effects did not warrant more than a prohibition on exposure to environmental hazards in the RFC because the record did not document "significant complaints" from these side effects. (R. 667.) Moreover, the ALJ found Plaintiff's testimony about why he did not pursue his own plumbing business was inconsistent from the first hearing to the second, from wanting to avoid forfeiting his pension to being unable to work due to his impairments. (R. 666.) Ultimately, the ALJ determined that based on the VE's testimony, there were a significant number of jobs in the national economy that Plaintiff could have performed before his DLI. (R. 671.)

## ANALYSIS

Plaintiff argues that this Court should reverse and remand the ALJ's decision for several reasons. The Court addresses each of these arguments below.

## I.    Legal Standard

"The ALJ's decision will be affirmed if it was supported by substantial evidence, which is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. An ALJ need not specifically address every piece of evidence, but must provide a logical bridge between the evidence and his conclusions." *Butler*, 4 F.4th at 501 (internal quotations and citations omitted). "We will not reweigh the evidence, resolve debatable evidentiary conflicts, determine

credibility, or substitute our judgment for the ALJ's determination so long as substantial evidence supports it." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021).

## II. Law of the Case and the ALJ's Treatment of Dr. May's Opinions

Plaintiff argues that the ALJ violated the law of the case doctrine by failing to provide, as required by the district court's remand order, "good reasons" for discounting Dr. May's 2010 opinion. (D.E. 17: Pl.'s Mem. in Supp. at 7-8.) The law of the case doctrine "requires the administrative agency, on remand from a court, to conform its further proceedings in the case to the principles set forth in the judicial decision unless there is a compelling reason to depart." *Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998).

### A. Social Security Regulations on Treating Physician Opinions

The district court's remand order follows the Social Security regulations, which state that for claims filed before March 27, 2017, the ALJ will give a treating source's medical opinion "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The ALJ must provide "good reasons" for not giving controlling weight to a treating source's opinion, including considering the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the treating physician's medical opinion, the consistency of the opinion with the record as a whole and the treating physician's specialization. *Id*. at (c)(2)(i-ii), (c)(3-6).

### B. The ALJ's "Good Reasons" for Discounting Dr. May's Opinions

Plaintiff contends that the ALJ's explanation for not giving significant weight to Dr. May's opinions was "legally insufficient," because the ALJ merely "identified minor inconsistencies" in Dr. May's opinions and failed to discuss evidence that supported Dr. May's opinion that Plaintiff

could not work due to his impairments. (Pl.'s Mem. at 8-9.) The Court disagrees. As described above, the ALJ provided a lengthy review of the medical record, including discussing lumbar MRIs and x-rays showing narrowing and degeneration, pain treatment and surgery performed by Dr. Chen, and examination notes from Dr. May and others that at times indicated Plaintiff demonstrated tenderness, positive straight leg-raise tests and decreased ROM in his lumbar spine.

In addition, the ALJ relied on more than "minor" inconsistencies to discount Dr. May's opinion. First, the ALJ found that Dr. May's opinions were inconsistent with the other evidence in the record, specifically with the determinations by Dr. Malik, two state agency physicians, and Dr. McKenna that Plaintiff could perform sedentary or light work notwithstanding some abnormal MRIs and examination results. The Seventh Circuit has repeatedly upheld ALJ decisions discounting treating physician opinions based on such inconsistencies with other medical evidence in the record. *See Karr v. Saul*, 989 F.3d 508, 511-12 (7th Cir. 2021) (affirming ALJ's decision to discount treating specialist's opinion because it conflicted with notes from the claimant's primary care provider and an emergency room visit); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020) (holding that the ALJ reasonably rejected the treating physician's opinion because it conflicted with the other medical evidence, including the state agency doctor's report); *Hall v. Berryhill*, 906 F.3d 640, 643 (7th Cir. 2018) (affirming ALJ's decision to discount treating physician's opinion because it "was at odds with the other doctors' opinions").

Second, the ALJ found Dr. May's opinions were contradicted by his own treatment notes, which did not suggest that Plaintiff had disabling functional limitations and which gave no hint to some of the limitations Dr. May put in his opinions, such as concentration problems that would keep Plaintiff off-task 20% of the workday. This, too, is a good reason for discounting a treating physician's opinion. *See*, *e.g.*, *Pavlicek v. Saul*, 994 F.3d 777, 781-82 (7th Cir. 2021) (affirming

13

ALJ's decision not to give controlling weight to treating physician's opinion that contradicted physician's own examination notes).

Third, the ALJ determined that Dr. May did not support his opinions with evidence from his own treatment notes or elsewhere in the record. Dr. May's opinions contained no reference to medical evidence, including, as the ALJ pointed out, the 2012 treadmill stress test results that Dr. McKenna found so significant.[10] In other words, Dr. May did not "present[] relevant evidence to support [his] medical opinion, particularly medical signs and laboratory findings," nor did he provide "an explanation" for his opinion. 20 C.F.R. § 404.1527(c)(3). This is another good reason to discount Dr. May's opinion. *See Hall*, 906 F.3d at 644 (affirming ALJ's decision to discount treating physician's opinion that "lacked detail and did not show that he knew of the functional capacity evaluation from 2008").

Fourth, the ALJ considered, albeit briefly, the length, nature and extent of Plaintiff's relationship with Dr. May, going through all of Dr. May's treatment records as Plaintiff's primary care physician since Plaintiff's alleged onset date. While the ALJ did not "march[] through the factors referenced in § 404.1527(c)(2)" in analyzing Dr. May's opinions, any error in failing to do so was harmless because the Court is "convinced that the ALJ would reach the same result on remand" as "the ALJ stood on firm ground in finding [Dr. May's] opinion . . . at odds with the weight of the other medical evidence." *Karr*, 989 F.3d at 512-13 (upholding ALJ's decision not to give controlling weight to treating physician opinion despite ALJ's failure to "expressly analyze" the opinion within the Section 404.1527(c)(2) framework, including failing to mention that the

---

[10] In his reply brief, Plaintiff argues that the Court should reject the ALJ's – and Dr. McKenna's – reliance on the treadmill test because it "comprise[d] a one-time snapshot" of his condition. (D.E. 32: Pl.'s Reply at 1.) But this would require the Court to reweigh this evidence, which the Court will not do in any instance, as we are prohibited from reweighing any of the evidence before the ALJ. *See Gedatus*, 994 F.3d at 900.

physician was the claimant's treating neurosurgeon, had reviewed the claimant's MRI results and had examined the claimant five years earlier). *See also Ray v. Saul*, 861 F. App'x 102, 106 (7th Cir. 2021) (holding that even if the ALJ had failed to expressly consider each of the § 404.1527(c) factors, any error was harmless because the treating physician's opinion conflicted with the conclusions of the agency consultants and the medical expert's testimony at the hearing). Thus, the ALJ's decision to discount Dr. May's opinions was supported by substantial evidence.

## III.    The RFC Was Supported by Substantial Evidence

Plaintiff also argues that the ALJ's RFC determination failed to account for several limitations caused by his impairments. We address each of Plaintiff's arguments below.

### A.    Manipulative and Lifting Limitations

Plaintiff contends that the ALJ erred by failing to explain why he did not include manipulative limitations in the RFC despite finding that Plaintiff had severe CTS prior to his DLI. (Pl.'s Mem. at 10.) Plaintiff argues that his 2016 hearing testimony, a function report he filled out in September 2010 and a function report his brother filled out in February 2009, followed by his complaints of right arm pain in April 2014 and CTS surgery in October 2014 and March 2015, "strongly suggests that [he] had significant and ongoing hand pain during the insured period which aligned with his post-DLI EMGs and surgeries." (*Id*. at 10-12.) Incongruously, Plaintiff also argues that the ALJ failed to adequately explain "why [he] could lift ten pounds occasionally and lesser weights frequently . . . as opposed to [Plaintiff's] alleged greater restriction," in part because Dr. Bajwa's opinion that Plaintiff could carry 10 pounds deserves less weight since it "dates to February 2009, well before the development of [Plaintiff's] hand problems in 2013 and 2014." (*Id*. at 16-17 and n.8.)[11]

---

[11] Plaintiff contends that the real incongruity is between the ALJ's opinion and Dr. McKenna's opinion that he could perform light work, meaning that he could lift twenty pounds occasionally and ten pounds

Whether or not Plaintiff showed that his hand pain or CTS began prior to his DLI, evidence that he had hand pain does not equate to evidence that he had resulting functional limitations during that period. Plaintiff bears the burden "to establish not just the existence of the conditions, but to provide evidence that they support specific limitations affecting [his] capacity to work." *Weaver v. Berryhill*, 746 F. App'x 574, 579 (7th Cir. 2018). Although Plaintiff indicated in a 2010 function report that he had some limitations due to pain and swelling in his hands (R. 274), none of his physicians' reports prior to October 2014 – 10 months after his DLI – suggested that Plaintiff had any limitations in his manipulative ability or additional limitations in his lifting ability due to hand pain or swelling,[12] and Plaintiff did not mention any limitation in his ability to use his hands at the first hearing. Moreover, the ALJ's lifting restrictions were "more limiting than that of any state agency doctor [], illustrating reasoned consideration given to the evidence." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Thus, the ALJ adequately supported the lifting and manipulative limitations in Plaintiff's RFC.

### B. Sitting Limitations

Plaintiff also argues that the ALJ failed to adequately explain "why [he] was capable of the prolonged sitting requirements of sedentary work given significant objective lumbar abnormalities." (Pl.'s Reply at 6; *see also* Pl.'s Mem. at 13-16.) Again, it was Plaintiff's burden "to provide evidence that they support specific limitations affecting [his] capacity to work." *Weaver*, 746 F. App'x at 579. It is Plaintiff, not the ALJ, who "bears the burden of proving that [he] is disabled" by "identifying any objective evidence in the record corroborating" his allegations, *Karr*, 989 F.3d at 513, and "show[ing] how [his] medically determinable impairments

---

frequently. (Pl.'s Mem. at 16.) But Dr. McKenna opined that Plaintiff would be limited to sedentary work if evidence from March 2014 was related back to before the DLI, which the ALJ did relate back.

[12] Although Plaintiff complained of right arm pain to Dr. May in April 2014, Dr. May recorded normal, full range of motion in Plaintiff's extremities at that time. (R. 1023, 1027.)

16

caused any limitations beyond those the ALJ found." *Gedatus*, 994 F.3d at 905. It is not the ALJ's job to "speculate on additional functional effects" from Plaintiff's lumbar problems. *Stephens v. Berryhill*, 888 F.3d 323, 328 (7th Cir. 2018).

Plaintiff further contends that the ALJ "independently reached the conclusion that [he] could perform sedentary work" because the ALJ "in effect rejected Dr. McKenna's testimony that [he] could perform light work, and also rejected Dr. May's opinion that [he] could sit . . . for less than two hours out of the workday in total." (Pl.'s Mem. at 15-16; Pl.'s Reply at 5.) This argument fails for two reasons. First, contrary to Plaintiff's argument, Dr. McKenna opined that Plaintiff would be limited to sedentary work before his DLI if the March 2014 MRI of his lumbar spine was related back three months (R. 738-39), and the ALJ explicitly related the 2014 MRI back to before Plaintiff's DLI. Second, "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians" in determining a claimant's RFC. *Whitehead v. Saul*, 841 F. App'x 976, 982-83 (7th Cir. 2020) (internal quotations omitted). The ALJ bears "final responsibility" for determining a claimant's RFC, *Fanta v. Saul*, 848 F. App'x 655, 658 (7th Cir. 2021), and "[a]n ALJ adequately supports his RFC determination when he 'consider[s] all limitations supported by [the] record evidence' and 'tie[s] the record evidence to the limitations included in the RFC finding.'" *Vang v. Saul*, 805 F. App'x 398, 401-02 (7th Cir. 2020) (quoting *Jozefyk v. Berryhill*, 923 F.3d 492, 497-98 (7th Cir. 2019)). Here, the ALJ considered all the medical evidence in the record and adequately supported the RFC he assigned to Plaintiff. *See Montalto v. Berryhill*, No. 17 C 5976, 2019 WL 1405602, at *12 (N.D. Ill. Mar. 28, 2019) (upholding ALJ's opinion that "described all the medical evidence she considered" in formulating the claimant's RFC). *See also Gedatus*, 994 F.3d at 900 (upholding

ALJ's RFC determination where the ALJ "considered and narrated [the claimant's] medical past at length, as well as her testimony and the state-agency physicians' opinions").

### C.      Elevating Legs

Plaintiff also contends that the ALJ "did not adequately explain why [his] alleged need to elevate his legs to alleviate pain was not supported by significant lumbar abnormalities and Dr. May's opinion" and thus omitted from the RFC. (Pl.'s Reply at 10.) According to Plaintiff, Dr. May's opinion on this issue was "uncontradicted" because it accords with Plaintiff's testimony and Dr. McKenna was not asked whether Plaintiff needed to elevate his legs. (Pl.'s Mem. at 17.)

There are several problems with Plaintiff's argument. First, Plaintiff's attorney examined Dr. McKenna extensively at the hearing and had every opportunity to ask him about Plaintiff's alleged need to elevate his legs. (*See* R. 741-49.) The attorney's decision not to do so should not yield an inference that Dr. May's opinion on the issue is uncontradicted. *See Harris v. Saul*, 835 F. App'x 881, 885 (7th Cir. 2020) (although an ALJ must fully and fairly develop the record, "a represented claimant, like [Plaintiff], is presumed to have made his best case before the ALJ").

Second, "an ALJ does not owe any deference to the portion of a treating physician's opinion based solely on the claimant's subjective complaints." *Karr*, 989 F.3d at 512 (applying this principle to treating physician's opinion that "may not even reflect [his] medical judgment, but instead only [the claimant's] own account of [his] symptoms"). Here, the ALJ discounted Dr. May's suggestion that Plaintiff elevate his legs because it was "not seen in the record" (R. 668), *i.e.*, it could only have come from Plaintiff's subjective complaints.

Third, the ALJ's determination that Plaintiff's self-reported need to elevate his legs was not credible was supported by substantial evidence. *See Britt v. Berryhill*, 889 F.3d 422, 425-26 (7th Cir. 2018) (holding that ALJ adequately explained decision to reject claimant's testimony

about need to elevate his foot to treat his pain). "So long as an ALJ gives specific reasons supported by the record, we will not overturn his credibility determination unless it is patently wrong." *Deborah M. v. Saul*, 994 F.3d 785, 789 (7th Cir. 2021). Here, the ALJ reviewed Plaintiff's testimony and his function reports and found no support for Plaintiff's allegation in the record. In addition, the ALJ found Plaintiff's allegations of such severe back pain were inconsistent with his daily activities and his treatment, including the lack of back injections or procedures since 2008, and the ALJ pointed out additional examples of inconsistencies in Plaintiff's testimony that led the ALJ to discount it. Thus, the ALJ's explanation for discounting Plaintiff's subjective allegations was adequate to satisfy the substantial evidence standard.

### D. Side Effects from Medication

The ALJ found Plaintiff's testimony that his medications caused drowsiness and dizziness was "reasonable" but that these side effects did not warrant more than a prohibition on exposure to environmental hazards in the RFC because the record did not document "significant complaints" from these side effects. (R. 667.) Plaintiff argues that "the ALJ . . . did not explain why [his] alleged need to nap during the day was not consistent with those side effects and thus incorporated into the RFC assessment." (Pl.'s Mem. at 19.)

It is not error for an ALJ to partially credit a claimant's testimony by "us[ing] what he heard from [the claimant] . . . to tailor an RFC that fit [his] limitations, though not necessarily the intensity to which [he] testified." *Green v. Saul*, 781 F. App'x 522, 527 (7th Cir. 2019). *See also Gedatus*, 994 F.3d at 901 (upholding ALJ determination denying disability benefits that "sided with [the claimant] to a degree by determining she had severe impairments and needed some limitations"); *Jozefyk*, 923 F.3d at 497 (upholding ALJ's decision to discount some of the claimant's self-reported limitations that were not corroborated by doctors' observations and credit

other portions of the claimant's testimony by including certain accommodations in the RFC). And where, as here, a claimant "simply points out that she complained of these side effects, without explaining how, if at all, they impacted her ability to work . . . any conclusion about how [it] impacted her ability to work would be pure speculation." *Arnold v. Saul*, 990 F.3d 1046, 1047-48 (7th Cir. 2021). Despite Plaintiff's testimony that he needed to nap during the day due to side effects from his narcotic medication, the ALJ determined that "this requirement is not supported by evidence other than [his] testimony, which the ALJ did not credit." *Green*, 781 F. App'x at 528. The ALJ's determination was not "patently wrong." *Deborah M.*, 994 F.3d at 789.

###### E.    Activities of Daily Living

Finally, Plaintiff argues that the ALJ improperly equated his ability to walk for exercise with the ability to perform full-time sedentary work. (Pl.'s Mem. at 18-19.) But the ALJ properly "considered the evidence of [Plaintiff's] daily activities in balance with the rest of [his] record." *Gebauer v. Saul*, 801 F. App'x 404, 410 (7th Cir. 2020). In addition to Plaintiff's daily walking, the ALJ considered that Plaintiff helped with household chores, mowed the lawn (and filled his mower with a two-gallon container of gasoline), ran errands and sang in the church choir. Although Plaintiff's "ability to perform daily activities does not necessarily translate into an ability to work full time . . . the ALJ correctly looked at Plaintiff's daily activities to see if they corroborated [his] claims, and []he found that they did not." *Deborah M.*, 994 F.3d at 791 (holding that the ALJ's failure to mention a few limitations on some of the claimant's activities did not make the credibility determination patently wrong). "This is hardly equating the activities with the ability to work full time. And, in any case, . . . any possible error was harmless" because Plaintiff's ADLs were "only one of many factors in assessing [his] RFC." *Kuykendoll v. Saul*, 801 F. App'x 433, 439 (7th Cir. 2020). *See also Burmester*, 920 F.3d at 510 (holding that the ALJ did not equate the claimant's

20

ability to perform certain activities of daily living with an ability to work full time, but instead used the claimant's reported activities to assess the credibility of her statements).

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court denies Plaintiff's motion for remand (D.E. 16) and grants the Commissioner's motion to affirm. (D.E. 27.)

ENTER:

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: November 30, 2021**